IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,
   *Plaintiff*,

v.

TI'QUAN DINKINS,
   *Defendant*

Criminal No. ELH-16-0548

**MEMORANDUM**

Ti'Quan Dinkins, the self-represented defendant, filed correspondence on May 22, 2020, which the Court has construed as a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF 127 (the "Motion"). He seeks relief from his sentence due to COVID-19. The Federal Public Defender has provided documentation of exhaustion but has not entered an appearance for the defendant. ECF 131; ECF 131-1. The government filed an opposition on July 1, 2020 (ECF 136) as well as exhibits. ECF 136-1 to ECF 136-3.

No hearing is necessary. For the reasons that follow, I shall deny the Motion.

**I.      Factual and Procedural Background**

On April 27, 2017, the defendant and a codefendant were charged in a First Superseding Indictment. ECF 4. In particular, Dinkins was charged with the offenses of conspiracy to commit carjacking, in violation of 18 U.S.C. § 371 (Count One); carjacking, in violation of 18 U.S.C. § 2119(1) (Count Four); and using, carrying, and brandishing a firearm during and in relation to a crime of violence (*i.e.*, carjacking), in violation of 18 U.S.C. § 924(c) (Count Five).

ECF 4. A Second Superseding Indictment, returned on July 6, 2017, named an additional defendant. ECF 34.[1]

Pursuant to a Plea Agreement (ECF 64), the defendant entered a plea of guilty on October 11, 2017, to all three counts. ECF 63. The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a total sentence of eight and a half years of imprisonment (*i.e.*, 102 months). *Id.* ¶ 8(f).

The Plea Agreement contained a Statement of Facts. *Id.* at 10-11. As set forth in the Plea Agreement, on May 19, 2016, the defendant was driving a Mercedes-Benz that had been reported stolen. Codefendant Jerome Pittman was riding in the front passenger seat and the other codefendant, Rashad Harris, was riding in the back. The defendant crashed the vehicle and, because the car was stolen and the defendant was carrying a firearm, the three occupants abandoned the vehicle and walked to a nearby gas station, where they were captured on video surveillance purchasing a few items. *Id.* at 10.

A few moments later, the three conspirators carjacked a Dodge Durango that was pulling up to a traffic light adjacent to the gas station. The defendant approached the driver's side window, brandished a firearm, and pressed the firearm into the driver's stomach while stating: "You know what it is." Pittman entered the front passenger seat as Harris entered the rear passenger seat. The driver exited his vehicle, the defendant entered the driver's seat, and the three drove off. *Id.*

The following day, the three conspirators took a selfie of themselves in the Durango, using the victim's iPhone. *Id.* at 11. According to the government, the photo was recovered by the victim from the iCloud. ECF 136 at 3. The defendants were wearing clothing that matched

---

[1] Jerome Pittman, one of the defendant's two coconspirators, was charged with a second carjacking (Count Two), during which he discharged a firearm (Count Three).

clothing worn by the individuals captured on the video surveillance at the gas station. *Id.* And, the victim identified the men in the photograph as the persons who had committed the carjacking. *Id.*

Sentencing was held on December 14, 2017. According to the Presentence Report ("PSR," ECF 70), the defendant was born in October 1996 and was 21 years old at the time of sentencing. *Id.* at 3. He had a final offense level of 19 for Counts One and Four (*id.* ¶ 27) and a criminal history category of II. *Id.*¶ 35. His advisory sentencing guidelines called for a sentence of 33 to 41 months of incarceration for Counts One and Four, and for a consecutive term of 84 months for Count Five. *Id.* ¶ 59. Thus, the total advisory sentencing range was 117 to 125 months of imprisonment.

Defendant was sentenced in accordance with the parties' Plea Agreement. In particular, he was sentenced to 18 months' imprisonment as to Count One, a concurrent term of 18 months' imprisonment as to Count Four, and 84 months' imprisonment, consecutive, as to Count Five, resulting in a below-guidelines sentence of eight and a half years (102 months), with credit dating to October 7, 2016. ECF 78 (Judgment).

The defendant is presently serving his sentence at the Federal Correctional Institution in Minersville, Pennsylvania ("FCI Schuylkill"). This facility is a medium security federal correctional institution with an adjacent minimum security satellite camp. According to the Bureau of Prisons ("BOP") website, the defendant's projected release date is September 10, 2024. He has served less than 40% of his sentence.

By letter dated June 2, 2020, the defendant asked the Warden to consider him for compassionate release and transfer to home confinement under the CARES Act because he

suffers from H1N1 asthma, as well as depression and anxiety, which he claims put him at heightened risk if infected by COVID-19. *See* ECF 131-1.

By letter dated June 12, 2020, the Warden denied the request. Among other things, the Warden concluded that the defendant did not have any medical condition qualifying him for release because he is "able to independently adapt to activities of daily living, and [is] able to perform self-maintenance activities in a correctional environment." ECF 136-1 at 1.

## II. Discussion

### A. Statutory Background

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824-25 (2010); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying motion for compassionate release because § 3582 "vests absolute discretion" in the

4

BOP).

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.

Section 3582(c) is titled "Modification of an imposed term of imprisonment." Under § 3582(c)(1)(A), the court, upon motion of the Director of BOP or the defendant, upon exhaustion of administrative rights, may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to

the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), a defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with the policy statement issued by the Sentencing Commission in U.S.S.G. § 1B1.13.

U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." The text mirrors the statute. Application Note 1 of U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows (emphasis added):

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:[2]
>
> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> > (I) **suffering from a serious physical or medical condition**,
> >
> > (II) suffering from a serious functional or cognitive impairment, or

---

[2] Subsection (2) of U.S.S.G. § 1B1.13 establishes as a relevant factor that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that **substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility** and from which he or she is not expected to recover.

Other extraordinary and compelling reasons include the age of the defendant (Application Note 1(B)) and Family Circumstances (Application Note 1(C)). Application Note 1(D) permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D).

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. The Guideline policy statement in U.S.S.G. § 1B1.13, along with the application notes, and BOP Program Statement 5050.50 define "extraordinary and compelling reasons" for compassionate release based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."

The defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 827. But, compassionate release is a "rare" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *United States v. Mangarella*, FDW-06-151,

2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### B.  COVID-19

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, ___ F. Supp. 3d ___, 2020 WL 2556496, at *1 (D. Md. May 20, 2020).  That crisis is COVID-19.[3]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

To be sure, the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories…." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted).  Unfortunately, there is currently no vaccine, cure, "or proven effective treatment" that is available. *Id.* (citation omitted).

The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868,

---

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *Antietam Battlefield*, 2020 WL at 2556496, at *1 n.1 (citation omitted).

at *1 (E.D. Mich. May 21, 2020), stayed, ___ Fed. App'x ___, 2020 WL 3100187 (6th Cir. June 11, 2020).  For a significant period of time, life as we have known it came to a halt.  Although many businesses have reopened, they are generally subject to substantial restrictions.   And, in view of the recent resurgence of the virus, businesses are again facing closure.

As of July 7, 2020, COVID-19 has infected about 3 million Americans and caused over 130,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed July 7, 2020).  Moreover, according to the Centers for Disease Control and Prevention ("CDC"), certain risk factors increase the chance of severe illness.  The risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus Disease 2019 (COVID-19), People Who Are At Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, to reflect the most recently available data, the CDC revised its guidance as to conditions that pose a higher risk of severe illness from COVID-19.  And, it created a second category for conditions that might present a risk for complications from COVID-19.  For example, "Severe to moderate asthma" is an underlying medical condition that was moved from the former category to the latter and is now identified as a condition that "might" put an individual at higher risk for COVID-19 complications.  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed May 21, 2020).  Social

9

distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2. Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*, *see also Cameron*, 2020 WL 2569868, at *1. They are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely");[4] *accord Brown v. Plata*, 563 U.S. 493 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. *See* ECF 136 at 5-7 (detailing preventive and mitigation measures that BOP has implemented to combat COVID-19). Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

---

[4] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and BOP employees from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Moreover, Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Nevertheless, as with the country as a whole, the virus persists in penal institutions.[5] As of July 7, 2020, the BOP reported that 1,992 inmates and 160 BOP staff currently tested positive for COVID-19; 5,137 inmates and 603 staff have recovered; and 94 inmates and one staff member have died from the virus. *See* https://www.bop.gov/coronavirus/ (last accessed July 7,

---

[5] The *New York Times* has reported that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide," N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2.

2020). With respect to FCI Schuykill, where Dinkins is a prisoner, there is currently one active case among about 1,052 inmates. https://www.bop.gov/coronavirus.

### C. Analysis

Defendant claims that he has asthma, anxiety, and depression, which put him at a greater risk for COVID-19 complications. ECF 127 at 2. In seeking compassionate release, Dinkins asserts that "all inmates are vulnerable to the virus," *id.* at 1, and that FCI Schuylkill has poor ventilation, *id.* at 2. He also expresses a concern that he could be transferred to another facility that is a "hotspot" for COVID-19 infection. *Id.*

Dinkins fails to identify any extraordinary and compelling reason to justify his release. He is not seriously ill or over 65 years of age. Although Dinkins alleges that he suffers from asthma, depression, and anxiety (ECF 127 at 2), those are not sufficient reasons for granting compassionate release. "Simply put, the coronavirus is not tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. March 24, 2020).

Even assuming that moderate to severe asthma may present a greater risk of complications due to COVID-19, there is no evidence of a risk to defendant. He is now 23 years of age, and available records reflect that he is in excellent health. The BOP provided the government with the last year of the defendant's medical history. *See* ECF 136-2. Notably, the records for February 26, 2020, do not reflect that the defendant suffers from asthma. In the section of defendant's medical records identifying "current medical conditions," the records list none. *Id.* at 5. Further, during a physical examination conducted on March 6, 2020, the medical provider's notes reflect the defendant had clear lungs and no wheezing. *Id.* at 15. The defendant does not appear to have a prescription or an inhaler or any other asthma medication. *See id.* at 30

(listing various over the counter medications for digestive and other ailments unrelated to asthma). With respect to the defendant's mental health, the medical records reflect treatment in 2018 with medication, but "no meds or symptoms of depression since." *Id.* at 11.

In any event, even if the Court determined that the defendant met one of the conditions establishing an extraordinary or compelling reason justifying release, the Court's analysis of the factors under 18 U.S.C. § 3553(a) readily leads the Court to conclude that release is not warranted. This was a very serious care, in which the defendant carjacked a man at gunpoint. By the age of 21, when the defendant was convicted of the underlying offenses, he already had two adult convictions. ECF 70, ¶¶ 33, 34. And, while incarcerated, he has sustained several disciplinary infractions. ECF 136-3.

To the extent that Dinkins seeks conversion of his sentence of imprisonment to a sentence of home detention, the Court cannot provide such relief. Home detention must be sought from the BOP. Section 3642(c) of 18 U.S.C. authorizes the transfer of an inmate from prison to home confinement. That section specifically provides: "The authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months." Section 12003(b)(2) of the CARES Act states that, during the COVID-19 emergency, "the Director of the Bureau [of Prisons] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." But, pursuant to § 3624(c)(2), that authority is given to the BOP, not to the courts. *See*, *e.g.*, *United States v. Williams*, JKB-15-0646, 2020 WL 1506222, at *1 (D. Md. Mar. 30, 2020).

13

## II. Conclusion

For the reasons stated above, I shall deny the Motion (ECF 127), without prejudice. An Order follows, consistent with this Memorandum.


Date: July 9, 2020 /s/
Ellen Lipton Hollander
United States District Judge